UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRIAN EINES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-00354-JPH-CSW |
| | ) |
| MAYNARD, | ) |
| EDMONDS, | ) |
| SERGEI, | ) |
| ZATECKY, | ) |
| ARAMARK CORRECTIONAL SERVICES | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT**

Brian Eines alleges that the defendants violated the Eighth Amendment by serving him chicken that had been stored for several hours at room temperature. Defendants have filed motions for summary judgment. For the reasons that follow, summary judgment is **GRANTED**.

**I.
Preliminary Matters**

The Court addresses several pending motions before getting to the merits of the motions for summary judgment.

**A.   Mr. Eines's request for summary judgment**

In his response to Defendants' summary judgment motions, Mr. Eines requests that summary judgment be entered in his favor. Dkt. 122. This request is denied because it is untimely—having been filed two months after the deadline for filing a motion for summary judgment, dkt. 107—and fails on

1

the merits because, as explained in this Order, Defendants are entitled to summary judgment.

    **B.**    **Mr. Eines's emergency motion to stay**

Mr. Eines has filed an emergency motion to stay proceedings, arguing that the Court never ruled on his filing at docket entry 83, which asserts that Defendants failed to produce video evidence and log books. Dkt. 129. To the extent docket entry 83 seeks relief separate from Mr. Eines's related motion for production of video evidence and log books, *see* dkt. 82, that request is denied for the reasons outlined in the Court's previous orders on this issue. *See* dkt. 88 ("Defendants have already produced all relevant video evidence."); dkt. 107 ("Defendants notified the Court that Plaintiff was able to view the video footage on August 3, 2022, and that they could not locate any additional video or log books."). Mr. Eines's emergency motion to stay proceedings is therefore **DENIED**. Dkt. [129]. Defendants' summary judgment motions are fully briefed and ready for disposition.

    **C.**    **Objection to Benefiel Declaration**

In his summary judgment response, Mr. Eines objects to Defendant Aramark's reliance on a declaration from Aaron Benefiel, a current Aramark employee who was not employed by Aramark at the time of the events at issue in this case. Mr. Benefiel was not disclosed as a witness, and he lacks personal knowledge of the events in this action. Dkt. 125 at 10. The Court will therefore disregard Mr. Benefiel's declaration and any assertions of fact relying solely on the declaration.

## II.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## III.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to [Mr. Eines] and draw[s] all reasonable inferences in [his] favor." *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. Food service at Pendleton

Mr. Eines was confined in H Cell House at Pendleton Correctional Facility in November 2020. Dkt. 116-1 at 10:14–19 (Eines Deposition). H Cell House is a restricted general population unit that houses inmates with disciplinary histories. *Id.* at 11:16–17. Inmates are confined to single cells and do not have cellmates. *Id.* at 11:21–12:1.

Staff for Defendant Aramark provide meals to inmates at Pendleton. Dkt. 116-2 ¶¶ 7–9. Inmates receive three meals: breakfast comes by itself in the early morning (around 4:00 a.m.) and lunch and dinner come together later in the day (between 9:00 a.m. and noon). Dkt. 116-1 at 16:4–18:11.

4

For the lunch and dinner delivery, the tray consists of a Styrofoam clamshell holding the lunch items and a sack holding the dinner items. Dkt. 115-2 ¶¶ 7, 8. After an Aramark employee delivers inmates' trays to the cell house, IDOC correctional officers begin sorting the trays based on the dietary needs for each range within the cellhouse. Dkt. 116-2 ¶ 11. On a normal day, it takes about an hour to sort and distribute the trays. *Id.* ¶ 15.

Inmates at Pendleton receive an "enhanced" meal on holidays. Dkt. 116-2 at 36−37. These meals contain more food items than the typical meal. *Id.* According to Defendants, delivery of these meals is often slower because they require more time to sort. Dkt. 116-2 ¶ 16. However, Mr. Eines testified that these meals would usually arrive the same time as a regular lunch. Dkt. 116-1 at 38.

The IDOC has promulgated a policy that establishes standards for food services programs at IDOC facilities. *See* Dkt. 123 at 10−33, IDOC Policy No. 04-01-301. Pendleton's "Facility Directive" provides, among other things, that food that must be stored at a specific temperature shall be served within four hours after being removed from temperature control; otherwise it shall be discarded. *Id.* at 2 ¶ E. This standard comes from Indiana State Department of Health regulations. *See* 410 Ind. Admin. Code §§ 7-24-193.

### B. Mr. Eines's allegations of food poisoning

Mr. Eines experienced food poisoning beginning on November 25, 2020. That day, Aramark served a holiday lunch tray in recognition of Thanksgiving. Dkt. 116-2 ¶ 18. The tray consisted of baked chicken, ham, mashed potatoes,

and pumpkin pie. Dkt. 116-1 at 35. Before this day, Mr. Eines had never experienced nausea, vomiting, or diarrhea because of contaminated food at Pendleton. Dkt. 116-1 at 28–29. Indeed, most of the food Mr. Eines ate was from the prison commissary, not meal trays issued by the prison. *Id.* at 64 (Mr. Eines reporting that he "very seldom[ly]" ate prison-issued food and that "90 percent" of the food he ate was from the prison commissary).

Correctional Officers Z. Maynard and S. Edmonds were assigned to Mr. Eines's range in H Cell House on November 25. Dkt. 116-2 ¶ 4; Dkt. 116-1 at 33–34. Their responsibilities included sorting the holiday lunch trays and distributing them to inmates. Dkt. 116-1 at 34. Officer J. Sergei was the officer in charge of the unit. *Id.*

The parties present competing versions of what happened during the delivery and distribution of the lunch meal.

According to Defendants, Aramark employees and inmates prepared the food trays and delivered them on a food cart to H Cell House. During delivery, some trays toppled over due to the wind. Dkt. 116-2 ¶ 19. Officers ordered replacement trays, which were prepared and delivered "multiple hours later" than the first round of trays. *Id.* ¶ 27.

According to Mr. Eines, the food cart containing the lunch trays arrived at H Cell House sometime around 10:25 a.m.[1] *See* Dkt. 122 at 2. Although he

---

[1] Mr. Eines testified in his deposition that he did not know exactly when the food cart arrived. Dkt. 116-1 at 30. However, in his response, Mr. Eines states the cart arrived at H Cell House at 10:24:16 a.m. based on a video that he reviewed in discovery. *See* Dkt. 79 ¶ 2. The video is not designated in the summary judgment record.

could not see from his cell when the food cart arrived, inmates were yelling "trays on the unit," so he knew when the trays arrived. Dkt. 116-1 at 34:23-35:5. Mr. Eines did not receive his tray until approximately 3:00 p.m., or perhaps as late as 4:00 p.m. *Id.* at 32:3-33:15.

During delivery of the lunch trays, Mr. Eines told Officer Maynard that the inmates needed new trays because they had been out for a while. *Id.* at 39:4-8. Officer Maynard responded that the trays had arrived thirty minutes before being distributed. Dkt. 1 at 4, ¶ 23; dkt. 116-1 at 34:6-17. But Mr. Eines did not believe him. Dkt. 116-1 at 34:13 ("It was obviously a lie."); *id.* at 34:25-35:5 ("We knew how long the trays had been sitting out there because when the trays arrive on the unit, inmates yell. 'Trays on the unit. Trays in the cell house.' Everybody yells. They sound off. 'Trays in the cell house.' So we knew when the trays had arrived."). Mr. Eines did not eat his dinner sack, and he ate only the chicken from the lunch tray. *Id.* at 71:15-19 ("That's all I ate. All I ate was that chicken."). He did not examine the chicken before he ate it, but there was no unusual smell or visible contamination. *Id.* at 41:18-42:3.

Later that evening, Mr. Eines began experiencing nausea, vomiting, and diarrhea. *Id.* at 52:22-53:7. He spoke with someone late at night from the medical staff and was told to drink a lot of fluids. *Id.* at 56:5-9. Mr. Eines's symptoms lasted less than 24 hours. *Id.* at 53:23-54:1. Mr. Eines submitted a healthcare request to be seen by the medical provider, but he missed the appointment because his unit was on lockdown. *Id.* at 57:11-58:23. He never

7

spoke about the matter with any medical professional after November 25. *Id.* at 59:24–60:4.

# IV.
# Discussion

Mr. Eines alleges that Defendants Officer Maynard, Officer Edmonds, Officer Sergei, Warden Zatecky (the "IDOC Defendants"), and Aramark violated the Eighth Amendment by serving him chicken that had been stored for several hours at room temperature. Dkt. 1. The IDOC Defendants argue that they are entitled to summary judgment on the affirmative defense of qualified immunity. Dkt. 117 at 10. Aramark argues that Mr. Eines has not designated evidence to support a policy claim under *Monell*. Dkt. 112 at 7-9.

### A. Qualified immunity

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna,* 577 U.S. 7, 11 (2015). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). Qualified immunity thus "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

The "difficult part" of the qualified-immunity test is "identifying the level of generality at which the constitutional right must be clearly established." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). A "high level of generality" is not appropriate; instead, the question is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Id.* While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). In other words, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).

When the affirmative defense of qualified immunity is raised, "the burden shifts to the plaintiff to defeat it." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). To meet that burden and overcome qualified immunity, the plaintiff must "show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 713 (7th Cir. 2013). The failure to do so means a plaintiff "cannot defeat" a "qualified immunity defense." *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (reversing summary judgment grant because plaintiff did not identify a sufficiently analogous case or explain why defendant's actions were plainly excessive); *Soriano v. Town of Cicero*, 521 F. App'x 565, 567 (7th Cir. 2013).

Here, the Court exercises its discretion to begin with the "clearly established" prong of the test. *See Pearson*, 555 U.S. at 236; *Findlay*, 722 F.3d

9

895 at 899 (noting that the court is "free to consider first whether the right is clearly established if doing so will conserve judicial resources."). It's beyond debate that the Eighth Amendment requires prison officials to provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (cleaned up). But the alleged "unlawfulness of [Defendants'] conduct does not follow immediately from" this highly generalized rule. *Wesby*, 583 U.S. at 64.

The Court assumes for purposes of resolving the motions for summary judgment that Mr. Eines's food tray was stored at room temperature for more than four hours before it was served to him.[2] *See* dkt. 116-1 at 42:13–43:8. Even so, Mr. Eines must identify a case that's sufficiently analogous to the facts here that it puts the IDOC Defendants on notice that serving the chicken violated a clearly established constitutional right. *See Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) ("Once the defense is raised, it becomes the plaintiff's burden to defeat it."). Mr. Eines, however, points to no controlling precedent that inmates have a constitutional right to not be served hot food that had been stored at room temperature for several hours.

Instead, Mr. Eines argues that Indiana prison regulations require cooked food to be served within four hours after being removed from temperature

---

[2] Because the Court assumes that Mr. Eines's version of events is true for summary judgment purposes, the parties' disputes regarding the existence of additional video evidence and log books are immaterial. *See* dkts. 78, 88, and 107 (orders addressing discovery disputes regarding video evidence and log books).

control, s*ee* Dkt. 123 at 2 ¶ 3.  But "the failure of officials to comply with departmental regulations or even state law does not necessarily violate the Constitution." *Courtney v. Butler*, 66 F.4th 1043, 1052 (7th Cir. 2023).  And Mr. Eines has not cited a case from which the defendants would have known that the failure to comply with the regulation amounted to a constitutional violation.

Nor has he explained why Defendants' actions so obviously violated the Eighth Amendment that any reasonable person would have known they were a violation.  *See Findlay*, 722 F.3d at 900. Moreover, the Court's review of Eighth Amendment case law does not reveal controlling precedent showing that serving Mr. Eines the chicken was "so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser*, 933 F.3d at 701.  On the contrary, there are cases holding that a single instance of unintentional food poisoning will never give rise to an Eighth Amendment violation. *See George v. King*, 837 F.2d 705, 707 (5th Cir. 1988) ("[A] single incident of unintended food poisoning, whether suffered by one or many prisoners at an institution, does not constitute a violation of the constitutional rights of the affected prisoners."); *Gloster v. Tanna*, No. 16 C 10428, 2017 WL 6523155, at *2 (N.D. Ill. Feb. 21, 2017) (same).  These cases undermine any argument that it was beyond debate that the IDOC Defendants would have known that serving the chicken to Mr. Eines was a constitutional violation.

As the Seventh Circuit has explained, the failure to identify a sufficiently analogous case or explain why defendant's actions were plainly excessive is

11

fatal to overcoming a qualified immunity defense. *Findlay*, 722 F.3d at 900; *Soriano*, 521 F. App'x at 567. The IDOC Defendants are therefore entitled to summary judgment based on qualified immunity.

### B. Section 1983 Claims against Aramark

To prevail on his § 1983 claim against Aramark, "a plaintiff must ultimately prove three elements: (1) an action pursuant to a [corporate] policy, practice, or widespread custom; (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations; and (3) causation, meaning the [corporate] action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014) (courts apply the same standard for § 1983 claims brought against municipalities to private corporations that contract with the state). Unless the unconstitutional results of the municipality's actions were "patently obvious," the plaintiff "must prove a prior pattern of similar constitutional violations resulting from the policy." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021).

Here, Mr. Eines identifies only one instance of food poisoning allegedly resulting from an inmate being served food stored at room temperature. No reasonable jury could find *Monell* liability from this one occurrence. *Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020) ("One single incident cannot suffice; rather, [a plaintiff] must show a series of constitutional violations.") (cleaned up).

Mr. Eines argues that Aramark's policy or widespread practice of relying on uncertified and inadequately trained prison staff to distribute meals caused an Eighth Amendment violation. Dkt. 122 at 14-15. But even if a jury could find the existence of such a policy or practice from the designated evidence, Mr. Eines's claim against Aramark nonetheless fails because is not "patently obvious" that the lack of specialized training of prison staff regarding food safety caused constitutional violations. *Dean*, 18 F.4th at 236. With no evidence of ongoing instances of food poisoning resulting from serving meals that were stored for several hours at room temperature, there is no evidence that would have put Aramark on notice of the need for additional training or supervision. On the contrary, he testified that this was the first instance of food poisoning he experienced at Pendleton. Dkt. 116-1 at 28:22–29:5. And aside from this incident, his lunch and dinner trays were usually delivered within a three-hour window. Dkt. 116-1 at 18:9–11.

Based on the undisputed evidence, a reasonable jury could not find that Aramark was deliberately indifferent through its corporate action. *Dean*, 18 F.4th at 236. Aramark is therefore entitled to summary judgment.

# V.
# Conclusion

Defendants' motions for summary judgment, dkts. [110] and [115], are **GRANTED.** Final judgment shall enter by separate order.

The motion to strike Mr. Eines's surreply, dkt. [127], is **DENIED**.

Mr. Eines's emergency motion to stay proceedings, dkt. [129], is **DENIED**, as is his request for summary judgment.

**SO ORDERED.**

Date: 9/21/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana


Distribution:

BRIAN EINES
988189
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel